Kanawha Investment Company v. Commissioner.
Kanawha Inv. Co. v. Commissioner
Docket No. 11112.
United States Tax Court
1948 Tax Ct. Memo LEXIS 27; 7 T.C.M. (CCH) 891; T.C.M. (RIA) 48249; November 26, 1948
H. D. Rollins, Esq., 721 Peoples Bldg., Charleston, W. Va., for the petitioner. Elmer L. Corbin, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in income tax for the year 1941 in the amount of $263.59. The deficiency results from disallowance of a deduction of $1,200 which was claimed to be an expense on account of the alleged salary of an officer. Petitioner concedes that the deduction is not allowable. Petitioner makes claim, for the first time, in its petition for deduction in the year *28 1941 of an alleged loss in the amount of $206,802.01, [1] and for refund of alleged overpayment of 1941 income tax in the amount of $919.70. The alleged loss is said to have been sustained in 1941 when petitioner terminated an agreement called a lease with a subsidiary corporation which had operated an office building owned by petitioner. Petitioner filed its return for 1941 with the collector for the district of West Virginia. The record consists of testimony, exhibits, and a brief stipulation of certain facts. Findings of Fact Petitioner, a West Virginia corporation was organized in 1908. Its office is in Charleston. West Virginia. It files its returns on the cash basis. The chief asset of petioner is an office building in Charleston called Peoples Building. Petitioner has owned this property at all times, both the fee and the improvements. The officers *29 of petitioner in 1941, and prior, were as follows: John Wehrle, president; H. L. Wehrle, vice president; S. G. Campbell, secretary-treasurer. In 1922 petitioner owned two parcels of land in Charleston, West Virginia, called the Kaufman and the Carr properties. Petitioner constructed a theatre and office building on the Kaufman property which was completed in 1922. This property was leased to T. L. Kearse. Petitioner caused the construction of an office building on the Carr property, under arrangements which are set forth hereinafter. This building was completed in 1924 and was called the Peoples Building. In 1922 petitioner caused to be organized a corporation called City Securities Corporation, which is referred to hereinafter as Securities. Its capital stock consisted of 50 shares of common, of which 45 shares were issued to petitioner and 5 shares were issued to qualifying stockholders. The common stock was the only voting stock of Securities. Petitioner owned 45 shares at all times. The 45 shares of common stock were issued to petitioner in September, 1922. On September 7, 1922, petitioner entered into an agreement with Securities, the agreement being called a lease. The *30 consideration for the agreement was stated to be the covenants and promises contained in the agreement; and further consideration was stated to be delivery of 45 shares of stock of Securities, and the payment of $500 by Securities to petitioner. The agreement was to run for 50 years to September 7, 1972. Under this agreement, petitioner assigned to Securities the rents under the Kearse lease, and leased the Carr property to Securities. Securities agreed to construct a building (Peoples) on the Carr property for not less than $425,000, but the building was to be the absolute property of petitioner. Under this agreement, Securities became the lessee of the building to be constructed; agreed to pay the taxes and insurance; and agreed to turn over the property to petitioner at the expiration of the lease. It was provided that the full rental to be paid under the lease for the entire term was the delivery of the 45 shares of Securities' stock, the payment of $500 in cash, and the construction of the building. However, Securities had no capital with which to construct the building. It was contemplated that preferred stock of Securities would be sold to obtain capital for the building. *31 At some time after its incorporation, Securities sold to petitioner, 6,500 shares of non-voting 7 per cent cumulative, preferred stock, par value $100 per share, in the total amount of $650,000. The stock was callable in series, and could be retired; and the stock could be called in advance of the stipulated call dates by paying $102 per share. This issue of preferred stock, called the first issue, was called and retired in 1927, as is set forth hereinafter, with funds which petitioner borrowed on its own notes from Metropolitan Life Insurance Company. Also, under an agreement of April 1, 1924, between petitioner and Securities, Securities sold to petitioner 2,000 shares additional, 7 per cent cumulative preferred stock, par value $100; total face amount $200,000, callable on certain dates by series, and callable for retirement prior to the stipulated callable dates at $102 per share. This issue is called the second issue. It was called and retired under a refinancing arrangement whereby 2,000 shares of new preferred stock were sold to petitioner, as is set forth hereinafter. On July 26, 1927, another agreement, called a lease, was made by the same parties, which had the same *32 terms, in most respects as the first lease, and which was to end fifty years thereafter, on August 15, 1977. However, the terms of the rental consideration were changed, as will be set forth hereinafter. Securities was not organized with any substantial amount of capital. S. G. Campbell, an officer of petitioner, was the president of Securities. Petitioner and Securities had the same directors. Securities had no office of its own; and it did not have separate books of account, its accounts of receipts and disbursements being kept in an account in petitioner's books. In July, 1927, petitioner obtained a loan from the Metropolitan Life Insurance Company of $650,000, for which petitioner gave its notes. The loan interest was 5 per cent. A first mortgage was given to Metropolitan on both the Kearse property and the Peoples property. Also, in July, 1927, Securities had outstanding 8,500 shares of nonvoting 7 per cent, cumulative preferred stock, of a par value of $100 per share, in the face amount of $850,000, as has been stated above. Petitioner and Securities entered into an agreement on July 26, 1927, under which the first lease of September 7, 1922, was to be surrendered by Securities, *33 and petitioner agreed to furnish funds for the retirement of the 8,500 shares of preferred stock. The loan from Metropolitan Life Insurance Company was used to retire $650,000 of the above stock. The remaining $200,000 was provided by Central Trust Company of West Virginia, under the following arrangement: (1) Securities sold 2,000 new shares of 7 per cent cumulative, preferred, nonvoting stock to petitioner and H. L. Wehrle for $200,000, which amount Securities agreed to use to retire the outstanding, second issue of $200,000 preferred stock. (2) Petitioner and Wehrle entered into an agreement with Central Trust Company to sell the stock to the Trust Company for $200,000. (3) The Trust Company deposited $200,000 in an account with which Securities paid the holders of the oustanding preferred stock in redemption of that stock, and that stock was retired. Under the new lease-agreement with Securities of July 26, 1927, Securities agreed to pay promptly the notes, together with interest, of petitioner to Metropolitan Life Insurance Company, and "other financial obligations" of petitioner. Under the separate agreement of July 26, 1927, relating to the issuance of the new preferred *34 stock of Securities and the retirement of its old preferred stock, it was agreed that Securities' obligation under the new lease-agreement to pay "other financial obligations" of petitioner, meant petitioner's obligation under its agreement with the Central Trust Company, to pay the dividends and the principal due under the terms of the preferred stock, which was redeemable on and after certain call dates, in the event that Securities was unable to pay either the dividends of the redemption price of the stock. It was agreed in the agreement relating to the sale of the new preferred stock to petitioner that Securities could repurchase or retire all or each part of each series of the new, third issue of preferred stock on any of the call dates by paying $100 per share and all dividends due at such time. Also, if any stock was not called and retired upon the dates specified for calling the the stock in series of $10,000 face amount during ten years, such stock could be called thereafter and repurchased and retired at par, plus all dividends due. Any stock called prior to August 15, 1930, was redeemable at $103 per share; but any stock called after August 15, 1930, was redeemable at *35 par. The new preferred stock was issued in ten series which were callable, progressively, and in increasing amounts on August 15 of each year beginning with August 15, 1933, and ending on August 15, 1942, so that on August 15, 1942, the entire $200,000 of stock would be redeemed and retired. On July 26, 1927, petitioner and H. L. Wehrle entered into an agreement with the Central Trust Company, a West Virginia corporation, under which petitioner and Wehrle sold the 2,000 shares of new preferred stock to Central Trust Company for $200,000. Under clauses 6 and 7 of this agreement, petitioner and Wehrle, or either, had the right voluntarily to repurchase the stock. In the event petitioner or Wehrle did not voluntarily repurchase the stock, they agreed to repurchase the stock upon demand of Central Trust Company, which could make such demand if Securities did not pay dividends semi-annually, or did not provide funds to retire each of the ten series in which the stock was issued upon the date when each series was callable. If Securities defaulted for thirty days in its obligation to pay dividends, or to provide funds annually for the redemption of a series, then petitioner and Wehrle were *36 bound, jointly and severally, as often as any default occurred, to repurchase the preferred stock outstanding at $100 per share, and accrued and accumulated dividends. In order to secure their agreement of repurchase, petitioner executed to Central Trust Company a second mortgage on the Peoples Building property, subject to the mortgage to Metropolitan Life; and assigned notes amounting to $131,000, as additional security. The full rental consideration in the new lease-agreement of July 26, 1927, for the fifty-year term, was the "assumption of the payment by the said Lessee [Securities] of the notes, interest, and other moneys" owing by petitioner to Metropolitan Life; and "also the assumption of the payment by the said Lessee [Securities] of the other financial obligations of the Lessor [petitioner]," together with the payment of five dollars in cash. Under the new lease-agreement, as under the first one which was made in 1922, petitioner assigned to Securities all of the rents under the lease of the Kearse property. It was also agreed under the new leaseagreement that in the event Metropolitan Life Insurance Company should release its lien on the Kaufman realty, on *37 which the Kearse building was located, Securities would, upon request of petitioner, release to petitioner the Carr property, upon which the Peoples Building was located, thereby releasing that property from the lease of July 26, 1927; and that Securities would assign to petitioner all of the leases to tenants in the Peoples Building; and that, in such event, petitioner would release Securities from its obligations under the lease, including release of the obligation of Securities to pay anything further upon the debt of petitioner to Metropolitan Life Insurance Company owing at the time of such release from the lease. From September, 1922, when petitioner made the first lease-agreement with Securities, until June, 1941, Securities operated the Peoples Building. There were about 172 offices and ground floor space in the building. Securities made the leases to the tenants of the Peoples Building. However, petitioner collected the rents and set them up on its books as a credit to Securities; paid all bills for Securities, and at the end of each calendar year made up a balance of the accounts of Securities and its own accounts. The net income of the building was applied to the payment *38 of interest and installments on the notes of petitioner which were held by Metropolitan Life; to the payment of dividends on the cumulative, 7 per cent, preferred stock; and to "rental expense" under the lease from petitioner in the amount of $13,000 per year, although the lease did not call for such payment. During the above period, there was a net amount of at least $649 [2] of the income of the Peoples Building and the Kearse Building after all expenditures and payments of obligations. The following schedule sets forth a summary of the total receipts of Securities under the two leases from 1922 through 1941, together with the total disbursements for current operating expenses and other annual expenditures in connection with operating the properties or property; and the total amounts applied to dividends on the preferred stock, rent paid to petitioner at the rate of $13,000 per year, and the total amounts applied to the indebtedness of petitioner to Metropolitan Life Insurance Company: RECEIPTS
September 1922 through June 1941.
Total Rents - Kearse and Peoples
Bldgs
$1,677,669.37
Receipts from other sources
75,201.83
Total
$1,752,871.20
DISBURSEMENTS
September 1922 through June 1941.
Current operating expenses and
miscel.
$ 751,947.55
Annual payment to Kanawha
1927/1941
180,374.98
Dividends & premiums on pfd. stock
1923/1940
397,657.33
Interest & payments to Metropoli-
tan 1928/1941
422,052.48
Net balance after above payments
838.86
Total
$1,752,871.20
*39 Petitioner sold the Kaufman property and Kearse Building to Kearse in 1938 for $350,000, which was paid, $150,000 in cash, and $200,000 under a purchase-money mortgage to petitioner. The sum of $150,000 was paid to Metropolitan Life Insurance Company in reduction of petitioner's indebtedness. At the end of 1941, the balance due Metropolitan Life was $385,000. Securities paid the dividends on its 7 per cent cumulative preferred stock in each year during the years 1923 to 1940, both years inclusive, except that petitioner paid dividends and premiums on the stock which it repurchased in 1939 and 1940, respectively, in the amounts of $2,640.55, and $310.59. In 1939 and 1940, Securities paid dividends on the preferred stock in the respective amounts of $4,287.50 and $1,435. Petitioner repurchased the 2,000 shares of the third issue of Securities' preferred stock during the years 1927, 1928, 1929, and 1936 through 1940, the largest amount being repurchased in 1939. After September 3, 1940, none of the stock was outstanding. Petitioner paid certain dividends and premiums *40 only in 1939 and 1940. The following schedule shows the repurchases of the preferred stock and the dividends and premiums paid by petitioner in the above stated years: Premiums &
Dividends
Amount Paid On
No. of Shares
Paid Upon
Repurchase at
Year
Repurchased
Repurchase $100 per Share
Total Paid
1927
195
$ 0
$ 19,500
$ 19,500
1928
54
0
5,400
5,400
1929
20
0
2,000
2,000
1936
100
0
10,000
10,000
1937
100
0
10,000
10,000
1938
276
0
27,600
27,600
1939
1,000
2,640.55
100,000
102,640.55
1940
255
310.59
25,500
25,810.59
Total
2,000 shares
$2,951.14
$200,000
$202,951.14
At some time prior to June 16, 1941, petitioner and Securities agreed to terminate the lease of the Peoples Building, and on June 16, 1941, the stockholders of Securities adopted a resolution to dissolve Securities Corporation. Securities paid petitioner six months' "rental" in 1941, in the amount of $6,500. Petitioner took over the Peoples Building in 1941. Opinion Petitioner seeks a deduction of $206,802.01 as a loss in 1941. The "identifiable event" or occasion which determined the loss, according to our understanding of petitioner's *41 theory, is either the termination of the lease of the Peoples Building or the dissolution of Securities Corporation in 1941. Petitioner's theory is not clear, and certain pertinent facts seem to be absent from the record. While the record provides considerable explanation of the financing of the Peoples Building property, it is not a complete record. In that situation, the facts have been found upon a full and careful consideration of that evidence which is before us, to the best of our ability to understand the various steps taken, under the limitation which a limited record imposes. There is no positive evidence that Securities Corporation was dissolved in 1941, but we have assumed that it was. If it was, the lease to Securities would have been surrendered to petitioner and the lesser leasehold estate then merged in the larger estate of the fee. See . However, the lease may have been terminated before the resolution was adopted to dissolve Securities, because petitioner reserved the right in the 1927, or second, lease to terminate the lease with respect to the Carr property and Peoples Building in the event the Kearse Building and the *42 Kaufman property were released from the mortgage held by Metropolitan Life. The Kearse property was sold to Kearse in 1938, and it may be that Metropolitan released that property from the mortgage held by it which covered both properties. While it seems pertinent to make observation about these matters, they are not critical in our considerations of the question presented because, in the last analysis, the question turns upon proof of actual loss in 1941. The loss claimed in the amount of $206,802.01 represents two items, the 45 shares of common stock and the 2,000 shares of the third issue of preferred stock of Securities at "cost" to petitioner. Petitioner takes the position that the common stock has a cost of $100 per share, the per value, or $4,500; and that the preferred stock has a net "cost" of $202,302.01, i.e., $202,951.14 which was paid upon repurchase during the period 1927 to 1940, less $649.13, a net cash balance of receipts above disbursements of Securities from 1922 through 1941. There is no evidence to establish that the common stock had a basis of $4,500. Petitioner entirely omits from its briefs consideration of the point and has made no breakdown of the total *43 amount which it seeks to deduct. The alleged loss involved in this proceeding was not claimed in petitioner's return for 1941, but was claimed for the first time in a claim for refund of 1941 tax on petitioner's income, which respondent denied. In the statement attached to the notice of deficiency, respondent determined, inter alia, "that the alleged loss is not allowable because it has not been shown that the loss was sustained in whole or in part [in 1941]." Petitioner has the burden of proving that the loss was sustained in 1941, and the amount of the loss. Petitioner has failed to sustain its burden of proof for the following reasons: Under the lease in question, dated July 26, 1927, the entire rent which Securities was obligated to pay during the fifty-year term thereof was to be the payment of petitioner's notes to Metropolitan Life, plus he interest thereon, and repayment to petitioner of its expenditures, if any, in redeeming any or all of the preferred stock of Securities, third issue, and in its payment of any dividends on the stock which might be in default, if any. The notes amounted to $650,000, at 5 per cent interest; the dividends on the preferred stock amounted *44 to $14,000 per year (7 per cent of $200,000, par value); and the preferred stock was to be redeemed at par in several series annually after August 15, 1933, or at $103 per share, if called for redemption prior to August 15, 1930. Under the lease, therefore, Securities was obligated to pay at least $650,000, plus interest, until that indebtedness was paid to Metropolitan, plus an undetermined amount, which depended upon how much petitioner might pay under its obligations under its agreement with the Central Trust Company dated July 26, 1927, to cure any defaults of Securities with respect to the preferred stock. There was no provision for any other payment as rent, by Securities to petitioner, but Securities, in fact, made certain payments to petitioner in cash in each year, as will be shown hereinafter. The evidence shows that Securities paid $422,052.48 on the notes and the interest thereon held by Metropolitan during the time the lease was in effect; that it paid dividends on its preferred stock in the amount of $14,000 in almost every year after the third issue was resold to Central Trust by petitioner in 1927, or in other amounts at the rate of 7 per cent of the face value of *45 the preferred stock outstanding. The total amount of dividends and premiums paid on the preferred stock was $397,657.33 during the period 1923 through 1940, of which $150,100 was paid by Securities during the period 1927 through 1940, which clearly constituted dividends paid on the third issue of preferred stock which was issued in July, 1927, exclusive of $16,100 which Securities paid in 1927 as premiums on redemption of stock, part of which may have included a premium of $3 per share on the 197 shares of the third issue which petitioner repurchased in 1927, which appears to have been done shortly after its resale to Central Trust Company. The evidence shows, also, that Securities began making cash payments as "rental expense" in 1927 and continued to do so into 1941 at the rate of $13,000 per year, and that the aggregate of these payments was $180,374.98. It was stated at the trial of this proceeding that Securities paid $13,000 per year to petitioner as rent in addition to its other payments on notes and interest. (See transcript, p. 53.) The only conclusion which can be drawn with respect to the payment of $180,374.98 is that it represented repayment to petitioner for its expenditures *46 in redeeming several series of the preferred stock, plus accrued dividends, which Securities was unable to redeem on the redemption dates. Securities' obligation under the lease to assume "other financial obligations" of petitioner, to wit, its obligation to cure any defaults of Securities in its obligation to pay dividends on and redeem, serially, the preferred stock, was thereby discharged. The evidence shows that petitioner repurchased 269 shares of the third issue of preferred stock in 1927, 1928, and 1929, prior to the date when the first series of the preferred stock was callable, which was on August 15, 1933. There is no evidence that Securities was in default with respect to dividends on these shares. The evidence shows, further, that petitioner repurchased the last two series of the preferred stock, 300 shares in each series, before their callable dates, August 15, 1941, and August 15, 1942. There is no evidence that Securities was in default in the dividend payments on those shares. Petitioner reserved the right to repurchase the preferred stock voluntarily, without being called upon to do so. It exercised that right in repurchasing 869 shares. It seems clear, therefore, *47 that petitioner's repurchase of the remaining 1,131 shares, having a face value of $113,100, plus $2,951.14 accrued dividends and premiums, in the redemption of which Securities may have defaulted, was not without reimbursement by Securities which paid petitioner $180,374.98 in cash, in addition to making payments of principal and interest on the petitioner's indebtedness to Metropolitan Life. Under the terms of the 1927 lease and the separate agreement with petitioner, the assumption must be made that Securities in fact retired at least 1,131 shares of its preferred stock prior to December 31, 1940, before the taxable year. There is no evidence to the contrary, and the evidence before us indicates that for all practical purposes that was done. As we observe the facts shown by the record before us, petitioner can claim to have held only 869 shares of preferred stock having a face value of $86,900, upon the dissolution of Securities in 1941. However, there must be applied to these shares $64,323.84 out of $180,374.98, the balance after applying that sum to the redemption of 1,131 shares, plus accrued dividends, noted above; and so applied it would appear that Securities, as a matter *48 of substance, retired 643 shares, face value $64,300, leaving 226 shares outstanding. Petitioner has not shown what the remaining useful life of the Peoples Building property was in 1941, but the lease was for fifty years, and had thirty-six years to run from 1941, and we must assume that it had a remaining useful life of thirty-six years. The evidence shows that the building produced substantial net income from rents each year; that petitioner's equity was increasing as the indebtedness under the first mortgage was reduced. At the end of 1941, the indebtedness to Metropolitan Life had been reduced to $385,000, and the second mortgage to Central Trust had been cancelled by the prior repurchase of all of the preferred stock. There is no evidence that the lease, if it was surrendered, did not have substantial value in 1941. Furthermore, in 1941, Securities was petitioner's wholly owned corporation, and its dissolution did not change in any respect petitioner's economic position. It has been stipulated that petitioner had been collecting all rents and other income during the period the lease was in effect prior to its termination or surrender in 1941. Petitioner at all times exercised *49 complete control over Securities. The facts raise a question whether Securities should be recognized as a separate entity. See ; and . Also, although the first lease provided that Securities was to build the Peoples Building at its own expense, Securities had no capital, and it never owned any property which could secure any borrowing or financing of its own independently of petitioner. As matters developed, petitioner provided all of the capital by its borrowing from Metropolitan and under the arrangement with Central Trust. Repayment of indebtedness was made out of the rents of the Peoples Building, and of the Kearse Building before the sale of that property in 1938; and it is stipulated the petitioner collected the rents. Upon full consideration of all the evidence, it is concluded and held that petitioner has failed to prove that it sustained a loss in 1941, upon the dissolution of Securities, of $206,802.01, or of any other amount. The matters discussed above have not been considered in any respect by petitioner in its briefs. Petitioner *50 rests its claim for deduction in 1941 entirely upon the rule expressed in . It cites no other authority in support of its contentions. In so doing, petitioner assumes certain ultimate facts, namely, that it has sustained a loss in the total amount of $206,802.01. The evidence does not support such assumptions. Respondent contends, inter alia, that petitioner has failed to show by competent evidence that it sustained a loss in the above amount in 1941; and that the Camp case is distinguishable from this proceeding. We agree with the respondent on both points. The Camp case is not applicable in the decision of the question in this proceeding. In the cited case, the Camp Manufacturing Company bought capital stock in B corporation, a newly organized corporation. Later, it sold some of the stock, under a guarantee to purchasers to make good to them the dividends on the stock in event of default, and to pay them the par value thereof, in redemption, in the event of liquidation of B corporation. Camp Company was not called upon to do either of these things. What it did do was to pay $5 per share to each stockholder to be released from the guaranty, *51 aggregating $12,463. We held that "a release from the obligation of guaranty, secured at a reasonable price, would be in keeping with good business practice"; and that "the expense in the amount reasonably necessary to secure a cancellation or release of such guaranty is a necessary and ordinary business expense." We did not pass upon an alternative question which was whether the expenditure constituted a loss under section 23(f). See pp. 472, 473 of the report in the Camp case, supra. Also, the expenditure involved was made during the year 1940, and the deduction was claimed in that year. In this proceeding, petitioner did not make any expenditure in 1941 in connection with the dividends or the redemption of preferred stock of Securities. Assuming, arguendo, that in earlier years petitioners made payments in some amount to holders of the preferred stock of Securities as a "guarantor," and that such payments, if made, would constitute a business expense deductible under section 23(a), the year in which to take deduction was the year in which the expenditures were made. Furthermore, petitioner was only a joint obligor under the guaranty, which was made by petitioner and H. L. Wehrle, *52 jointly and severally. And, finally, the facts show that petitioner was reimbursed by Securities for any and all payments made under the guaranty. We conclude that the Camp case has no applicability to the decision of the question in this proceeding, and that this proceeding, on its facts, is clearly distinguishable from the Camp case. Decision will be entered for the respondent. Footnotes
1. It appears from the amended petition and from the evidence that the amount of the alleged loss claimed for deduction is $206,802.01, as stated above; but there is a statement in the amended petition, also, that the loss was in the amount of $206,871.69. On brief, the amount of the loss is stated to be $206,802.01.↩
2. This amount is stated in an exhibit. Upon checking the exhibit details, net amount appears to be about $838.↩